Good morning, ladies and gentlemen. Our first case for argument, S.A.B. v. Lynch, Ms. Heffern. Good morning. May it please the Court. I'm Vanessa Marti Hefftman. I will address the inadmissibility finding. My colleague, Harlan Sengdahl, will address issues related to exemptions to inadmissibility. Our client, a 61-year-old Ethiopian woman, fled in 2004 after being tortured and brutally interrogated for four months by the police due to her involvement with a pro-democracy political opposition group, the Aroma Liberation Front, or OLF, an involvement which consisted largely of making spices for bake sales and attending meetings to help disadvantaged women. The government... Your Honor, after our client fled Ethiopia in 2004, the police, when they were unable to locate her, imprisoned and tortured her sister. The government continues to oppress supporters of the OLF. We have quite a few asylum cases, and they're named in the briefs and named in our opinions. What's the justification for your client proceeding under admissions? Respectfully, Your Honor... You filed a motion which basically said all asylum cases should be anonymous. Well, that's not our policy. So I'm trying to figure out whether there's a special reason for your client. I notice that the board's opinion used your client's name. Your Honor, we believe it's important to protect the safety of our client and we... Okay, so you're just repeating the assertion all asylum cases should be anonymous. That's not going anywhere. Is there some reason for a difference with your client's case? Respectfully, Your Honor, in this case the immigration judge expressly found it was more likely than not that our client would be tortured upon return to Ethiopia, a possibility that remains... She won't be returned to Ethiopia unless that's no longer true. If conditions change such that it no longer meets the more likely than not standard. While that might warrant return, it could still pose a risk to her safety were she to come back and perhaps we were slightly off in our analysis of practice. Is there anything that is true about your client's claim that would not be true of every asylum claim? I don't think every asylum claim satisfies the standard under the Convention Against Torture. Whether there is something unique about... Well, they usually satisfy that standard if the alien is credited. In some circumstances, but it is a different standard. It's a higher standard of more likely than not tortured upon return to that country. It is certainly possible there are other applicants that would satisfy both asylum and the Convention Against Torture standard, and in those circumstances, those applicants as well very well might be entitled to the additional protection of an anonymous acronym in proceedings such as these. The judge here expressly found our client entirely credible based on the horrific record of what she and her family suffered, but concluded that she was inadmissible and barred from asylum and withholding because he concluded that the OLF met the definition of an undesignated terrorist organization, relying on the accusations of the same government that tortured her and murdered her family instead of qualified expert testimony discrediting those claims. A finding that the government contends should continue to bar our client from relief, even though the Secretary of Homeland Security has stated that supporters of the OLF should be exempt from the terrorism bars. This is not the case for which the terrorism bars were intended to apply. I will address two issues, the Tier 3 finding and the knowledge exception to the terrorism bar. The judge's finding that the OLF satisfied the statutory definition was premised on application of a legally incorrect evidentiary standard. The government acknowledges at page 52 of its brief that the judge did not rely on attacks that the OLF denied involvement with or even resolved factually whether the OLF had involvement with those incidents. Instead, his opinion was based on the uncorroborated and unattributed claim in one publication, Jane's World, that the OLF took responsibility for three attacks. The judge rejected the expert testimony refuting that claim and discrediting that source solely because the expert did not provide independent corroborative evidence to prove a negative, that the OLF did not commit or take credit for three attacks that Jane's World said it had without identifying any sources. Are you saying that OLF was not a terrorist organization? That is our contention, yes. As the Ninth Circuit held in Singh v. O'Neill... I thought your argument was that she didn't believe it was, didn't know it was. Your Honor, we contend both findings were in error, that the OLF did not satisfy the statutory definition based on the judge's application of an improper evidentiary standard as well as the argument that even were they... You're saying there's no evidence that OLF is a terrorist organization? The evidence that the judge chose to rely on, the single source which was discredited and refuted by the expert, did not support the finding that the tier three designation had been satisfied because the judge concluded he could not consider the expert evidence refuting that because of a legal standard, that the expert needed to have direct evidence to corroborate his own testimony. Testimony that included that the expert had personally spoken with OLF representatives that reside in Washington, D.C. who disclaimed any involvement with the three specific incidents discussed in the Jane's World report. Requiring such additional evidence beyond what the preponderance standard requires is legal error, as this court held in Lara v. Lynch. In addition, in the government's effort to defend the tier three finding here, the government repeatedly violates the Chenery Doctrine by relying on facts and evidence that were not the basis for the judge's decision, including sources outside of the record such as other judicial decisions discussing OLF activities that occurred nearly a decade before our client's involvement. As well as facts, for instance, that the judge did not even rely upon. For instance, the government claims in its brief that the OLF took responsibility for a bombing in 2002 at the Tigray Hotel, but the judge himself found in his opinion that government sources reported the OLF had denied involvement with that incident. Once those Chenery violations are discounted, the record compels the conclusion that substantial evidence... What was the basis for Schaeffer saying that Jane's World reports are biased, market-driven, and shoddily verified? Jane's is a very well-known, established... student of military activity all around the world and so on. Why did Schaeffer dismiss it so abruptly? I think what Schaeffer was focused on was the allegation in Jane's World, what the judge relied on, the specific claim of responsibility that the OLF had taken credit for three particular attacks. That was the focus of the judge's opinion and Schaeffer's testimony was that those particular claims in Jane's World were unverified, unsubstantiated, and that the OLF, in fact, denied involvement. How does he know? As Dr. Schaeffer testified, he spoke with OLF representatives and he had extensive experience in Ethiopia, residing there, had worked for Amnesty International. Indeed, the judge found him to be a well-credentialed expert, including on this very issue, whether the OLF engaged in the violent activities that the government accused it of. Your Honor, I see that I've exceeded eight minutes. Unless the panel has further questions about the knowledge exception, I would turn it over to my colleague, Ms. Sengdahl, to discuss the exemptions. Okay, that's fine. Ms. Sengdahl. Thank you. Thank you. Good morning, and may it please the Court. My name is Karlyn Sengdahl. As my colleague noted, I will be addressing the portions of this appeal regarding errors in the United States citizenship and immigration services exemptions. As this Court noted in FHT, Congress was concerned that the breadth of the definition of terrorism in 8 U.S.C. 1182 might sweep too broadly, effectively denying asylum to otherwise deserving applicants. For this reason, Congress authorized the Secretaries of State and Department of Homeland Security, DHS, to issue exemptions. This exemption authority was designed to prevent exactly the problem we are faced with today, someone deserving of asylum but who has been unable to receive it. DHS has issued more than a dozen group exemptions, primarily to opposition groups fighting undemocratic governments, including, as relevant here, the OLF. These groups are essentially the good guys, people fighting oppression of ethnic and religious minorities. The immigration judge said that several sources, including the U.S. Department of State and independent news agencies, have reported incidents of violence perpetrated by the OLF. Now, it goes on to say, Dr. Schaefer indicates he doesn't have personal knowledge. What is an immigration judge supposed to do if that is the record? There's some evidence that OLF is violent, and some evidence it isn't. What do you do? Substantial evidence must support the immigration judge's findings. Could you raise your voice, please? Yes, sure. Substantial evidence must support immigration judge's findings. Here, the topic I'm addressing... There was substantial evidence, what I just read. You have substantial evidence on both sides. What do you do? You must weigh the evidence, I suppose. Well, really, that's not realistic. And anyway, if weighing evidence is what has to be done, don't we have to give some weight to what the immigration judge... to the weights that the immigration judge attaches to the competing evidence? I presume that my colleague will address some of these questions on rebuttals. No, you really need to be prepared to address your client's case. Okay. My apologies. I suppose... We don't want to play a game in which each lawyer says, somebody else will talk about that. You're here. You need to talk about it. Okay. I understand. Okay. Can you repeat your question? You need to raise your voice. Can you... Oh, I'm sorry. Can you please repeat your question, Your Honor? Pardon? Could you... Well, I was just reading from the immigration judge's opinion, which, as I say, you have several sources, including U.S. Department of State and so on, report that OLF engaged in violence, and then you have Schaefer not saying they don't engage in violence, but saying he doesn't have personal knowledge that they've engaged in violence. That sounds like the weight of the evidence is in favor of a finding of violence. I believe some of what Dr. Schaefer was criticizing was that some of the reports, especially in the Janes world, articles were not necessarily corroborated by outside evidence. Was he criticizing the State Department also? Yes. I don't believe so. Because that's what the immigration judge started with, the State Department. The State Department memos, in one sentence, addressed landmine usage, and that in itself was not necessarily corroborated, that it was actually the OLF that was using those lines. Does the State Department have to be corroborated? I don't get that. It can be contradicted, certainly. But any corroboration for everything the State Department says? I suppose it's subject to contradiction. But as they say, this passage in the immigration judge's opinion does not have Schaefer saying the opposite. He doesn't know whether the OLF engaged in violence. That's not very strong evidence for SAP. Okay. DHS issued numerous group exemptions, including to OLF. After our client was found eligible for asylum but for the terrorism bar, USCIS considered her for an OLF group exemption based on her involvement with the group. However, DHS policy regarding the OLF group makes OLF members in removal proceedings ineligible for the exemption. It's our position that this is contrary to law as it conflicts with congressional language and intent. The statute broadly defines exemption eligibility to include any alien, except those who supported Tier 1 and Tier 2 terrorist groups and who supported terrorist groups that targeted civilians. The statute does not hinge eligibility for the exemptions on the status of removal proceedings. In fact, the statute suggests two ways that aliens in removal proceedings may be considered for exemptions. First, the statute provides a mechanism for aliens in removal proceedings to be considered for exemptions by the DHS as opposed to the Secretary of State. In addition, Congress made exemption determinations reviewable only in final orders of removal, which presupposes removal proceedings. But the OLF policy redefines eligibility in a manner that conflicts with that statute because it exempts as a blanket all OLF members in removal proceedings. The relevant case law instructs that redefining eligibility is inherently different from enumerating factors to consider when deciding whether or not to grant discretionary relief. The former is impermissible when done in a manner that conflicts with the statute. For example, in Sukhar V. Ashcroft, the First Circuit held that a regulation promulgated by the Attorney General was contrary to law because it redefined eligibility for adjustment of status to carve out paroled aliens in removal proceedings because the statute allowed all paroled aliens to seek adjustment of status and carved out specific categories of individuals that were precluded but did not include paroled aliens in removal proceedings in those carve-outs. The same is true here. Just as in Sukhar, Congress made other groups ineligible for exemptions. If it had wanted to include individuals in removal proceedings, it could have done so. But the opposite is true. The statute authorizes DHS to consider aliens in removal proceedings for these exemptions. Well, I'm not sure the analogy works here because adjustment of status is a statutory right. There's a statutory right to apply for adjustment of status, and we don't have a corresponding statutory right to an exemption here. Correct. It is a matter of discretion. However, once the agency exercises discretion to grant the OLF group exemption generally, it should not, as our position, be free to redefine how Congress defined eligibility. But it also created an exception to the exemption for those with pending removal proceedings. And that's the category that your client finds herself in. That's why she can't get the exemption. The problem is that DHS has never done this in any of its other group exemptions. There's no prohibition on individuals in removal proceedings in other groups. What difference does that make? These are treating OLF members differently without a reasonable basis for that distinction. I see my time is up. If you have any further questions, I'd be happy to answer them. Otherwise, I'll turn it over to the Court of Counsel. Okay. Well, thank you, Ms. Sundahl. Thank you. Mr. Cantor? May it please the Court, Ethan Cantor on behalf of the respondent, Attorney General. In response to counsel's argument, particularly related to OLF claims of responsibility, the thrust of their argument really misreads the immigration judge's decision on that point. Page 8 of their reply brief, they note that the critical fact upon which the immigration judge relied for his conclusion was three claims of responsibility for attacks by OLF contained in the Jane's World Report. However, this is not so. This is not the critical fact on which the immigration judge relied. It was a subsidiary fact. It was an additional consideration. What the immigration judge relied on, as I think your Honor referred to, was broader. It was a broader conclusion based on a broader range of evidence. So it's really a straw man to say that the IJ relied on this narrower ground when, in fact, it was much broader. Indeed, a claim of responsibility for a terrorist attack is not the sole evidentiary test for whether that attack occurred any more than petitioner's asserted complete faith in the OLF leadership's denials of responsibility is a reasonable basis upon which to decide whether she reasonably should have known that they were a terrorist organization. The Chenery point that counsel made, I'd like to respond to that as well. The immigration court in this case held five substantive hearings, two board appeals comprising three decisions, very detailed decision, 26 pages, single-spaced, and discussed a lot of evidence. Examination of the record in relation to those decisions, I think, bears out that the government's argument, the arguments in our brief discussing that evidence and the immigration judge's reliance on that evidence fall squarely within the Chenery guidelines of this court. And because counsel mentioned it, I just want to take one example where I think that the petitioner overreached. And it was mentioned again here today that the government suggested that the OLF took responsibility for the bombing of the Tigray Hotel in 2002, and they cite to page 56 of our brief. In fact, we did cite from the record a BBC News report, which is an independent news agency that the immigration judge noted in his decision and listed as an exhibit. And in fact, that's true. The OLF did not take responsibility for the Tigray Hotel bombing, but we did not suggest that it had. We listed a number of incidents in which, and I'll quote from our brief, the OLF had claimed responsibility, been suspected, been attributed responsibility, or denied involvement. So this is unfair characterization of our argument, and it relates to this, I think, effort to narrow the issue to the exclusion of what really shows a substantial basis for the immigration judge's conclusions in this case. Let me address, in the time that I have remaining, two additional issues that arise in this case. One, and also mentioned by counsel, relating to the equal protection claim. We have discussed four, there are four hurdles that have to be overcome to even consider whether there's an equal protection violation. Because, as petitioner concedes, this is unfettered discretion, and there are many decisions in this court that hold there are no due process liberty interests in discretionary relief. The equal protection interest in the federal context derives from the due process clause. Without a due process liberty interest, there's no federal related equal protection interest. Secondly, the justiciability. Petitioner's argument is, well, there's jurisdiction. There's legal and constitutional jurisdiction. However, it is well established that subject matter jurisdiction and justiciability are distinct. Thirdly, Supreme Court cases that establish categorical exclusions from discretionary relief, deciding who among those who are eligible for what the court described as an act of grace or a pardon, is authorized under the Supreme Court's precedent. And finally, if you get to the equal protection claim, it's really answered, I think, succinctly by the Supreme Court's decision in American-Arab Anti-Discrimination Committee v. Reno. That was an equal protection case. It was about selective prosecution. Who would be put into deportation proceedings and who would not? That was what the case was about. So really, it has both of the elements at play in this matter. An exclusion based on who's in removal and who isn't, and terrorism. And there, the court concluded in its penultimate holding, that when an alien's continuing presence in this country is in violation of the immigration laws, the government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity. 525 U.S. at 491-92. In other words, the Secretary's categorical exclusion from OLF exemption eligibility, respecting aliens who are in removal proceedings, is precisely the same thing. It's a rational distinction regarding who among those that may be eligible may also be excluded for the Secretary in exercising his congressionally delegated discretion. Does the Ethiopian government want her back? There is no indication in the record, to my knowledge, that there's been a request, or there is some evidence in the record related to after she left that there were questions about her. But those are, I think, soon after she left. So does she engage in criminal activity or terrorist activity in the United States? No. Or speak up for OLF? No, and there's nothing on that in the record. So she's harmless? Excuse me? She's harmless? It falls into the category of an individual who provided material support, solicited funds. To a foreign government that doesn't care about her. And if she's behaving herself in the United States, what's the interest in deporting her? With respect, I don't think there is interest. I think there's a conundrum, if you will, which is the notion that we're dealing with this matter as terrorism. And yet the law has decided that it will travel very far down the chain of causation for terrorism to reach those who provide it. But I don't understand. This is terrorism in a foreign country. And there's no American interest. And the foreign country doesn't care about her. And she behaves herself in the United States. So what's the benefit to us of deporting her? This individual has been granted the relief of deferral of removal under the torture convention. She is not going to be removed. The government did not contest that. Excuse me? What is this case about? This case is about... She's never leaving? Well, I take it the case is about the difference between asylum and deferral of removal. They have somewhat different legal rights. Yes, it's the question about the more permanent relief of asylum. But I think to your question, Your Honor, it's really about a broad congressional scheme that applies immigration terrorism bars very broadly and then delegates to the executive branch the task of sorting out, making distinctions. This individual has been considered under three separate exemption authorities. How long is her removal going to be deferred? It will be deferred until conditions change such that there is no longer... It's no longer more probable than not that she would be tortured. And that would depend on the agency commencing a new, in effect, a new proceeding against the petition. A new proceeding? Yes, that conditions have changed such that there's no longer a threat of torture or she could be removed to a third country. That would be permissible with regard to a grant of deferral of... Why would we want to remove her to a third country? I'm not saying we do. I have no knowledge of any interest to commence or question the CAT relief. Indeed, as I said, the government did not challenge it below in the appeal to the board and the government does not quarrel with the CAT relief grant here before this court. Does she work in the United States? I do not know. Is she legally authorized to work in the United States? I thought that's one of the differences between deferral of removal and asylum. Somebody who receives asylum gets authorization to work in the United States. Somebody who gets deferral of removal does not. I think Your Honor is correct. However, during the pendency of a proceeding related to asylum, there may be... Counsel would know precisely whether there's work authorization. It wasn't an issue in the case, so I don't know. Mm-hmm. That it? Do we have something further you'd like to say? Yes. Because I addressed the OLF exemption, I just wanted to address there were two other exemption authorities, one being certain limited material support that they don't challenge. They don't challenge that denial. Then there's insignificant material support where the petitioner's argument was insufficient analysis and determination by the agency. I think the analysis and determination is more than sufficient. The exemption authority sets out the factors to consider being relative value, fungibility of the support, quantity and volume, duration and frequency. In a paragraph, two paragraphs in the decision, the agency reviews the monetary and sustained efforts in recruitment of members, volunteer activities, collection of dues and other activities in support of the OLF, which grounded its conclusion that her support for the OLF was not insignificant. With that, I would ask the court to sustain the board's finding, the board's order in this case, as well as the decision by the Department of Homeland Security denying the petitioner an exemption. Just for clarification, your first argument on the OLF group exemption is that we have no jurisdiction. Is that not right? The statute provides legal constitutional review. Our argument, our position is that they have failed, petitioner has failed to state a cognizable legal or constitutional claim. Okay. Thank you, Mr. President. Thank you very much. Ms. Hefftman or Ms. Sando? So does she work here in the United States? Yes, she has work authorization. What does she do? I'm not certain right at this moment in time what her current employment is. I apologize. Does she have legal authority to work? She does have work authorization, yes. And it is renewed annually under the Convention Against Torture, which is different than under a grant of asylum, which also differs from relief under the Convention Against Torture in several ways, including allowing for adjustment of status, the ability to petition for family members, the path to citizenship. This court has previously recognized that the Convention Against Torture protection is not synonymous with, in any fashion, the protection that the more permanent protection she would be entitled to with asylum. In addition, the question came up about Schaeffer's lack of personal knowledge. This ties directly to the legal error the judge committed by requiring that the expert have personal knowledge, direct evidence to refute the claim in Jane's world, which was unsupported with any source or identification, is simply an improper legal standard. And it would mean that even a single unsupported claim in one article would be sufficient to satisfy the statutory definition. Essentially, it would be impossible to rebut that claim under the direct corroborative evidence standard that the judge applied. In addition, even if this court credits the Tier 3 determination, the judge's finding that our client lacked knowledge of the group's activities is soundly supported by this court's decision in Kahn v. Holder, in which it acknowledged that low-level members of a group such as our client, who undisputedly's involvement was limited to bake sales and women groups meetings, and who credibly testified she had no knowledge of violence committed by her group. Was the Kahn argument presented to the agency? The argument that she did not have knowledge was certainly... How could that be? I believe the Kahn decision... Don't they have, you know, newspapers and radios and so on in Ethiopia? Certainly... If you live in Ethiopia and they report these attacks, you know, beginning in, I don't know, early in 2002, killing people and so on, doesn't the population learn about that? Certainly, and she testified that she heard two reports on the radio. Again, we're talking about 2002, not the current day where we have current access to everything on our phones. Right, so she knew the OLF engaged in terrorist activities. Respectfully, Your Honor, she knew the government accused them. She investigated... No, it's on the... You don't think it's true there are these... I'm looking at this Jane's report. They killed one person, they killed three people, killed 11 people. And this presumably is reported. And wouldn't... Certainly someone who was involved with the OLF would learn that there were these radio reports. Surely. Your Honor, her access... You're working, you're connected with an organization and it turns out that it's regarded as a terrorist organization, goes around killing people. You hear about that. You think you'd say, wait, I mustn't be, I can't allow myself to be a part of this organization, goes around killing people. And she did diligently investigate those claims, as Professor Schaefer testified. What do you mean diligently investigate? It's all on the radio, presumably. Ethiopia must have radio. And she did have access to radio. That was where she heard two reports and only two is what she testified to. Do you think it was all made up that OLF killed people? As Dr. Schaefer testified and the record corroborates, including, for instance, the Human Rights Watch report that the government relies heavily on now for the first time in its brief, corroborate that the government accuses the OLF of violence as a means to justify its repression of a political opposition group, as well as- So you say OLF has never killed anybody? Early on in its origins, this is a group that began in 1973, the group was involved in armed struggle during the civil conflict in the early 1990s. Dr. Schaefer himself conceded that. And again, it's a way in which the government tries to rope in all evidence of any activity the OLF has ever engaged in in any time period. The relevant issue is what she knew of in this time period. And that was two reports on the radio which she was- she heard the government accusing, she investigated with the local leaders, as precisely described in the con decision. They denied any involvement. Everyone around her that she knew who had involvement with the OLF denied it. That testimony was credible. Are these OLF people Ethiopian, you know, culturally, physically, whatever, or they belong to some minority group, you know? They're all- Eritreans or something? No, they are not of another country. They're all Ethiopians. They're all Ethiopians. The Oromo are a minority ethnic group within Ethiopia, although a very sizable one, explaining why the government is so focused on ensuring that this group cannot come to power. I believe my time has expired. If there's any further questions, if not, I will- Okay. Well, thank you very much. Thank you, Your Honor. So we move on to our next case.